**FEDERAL TRADE COMMISSION,**
**Plaintiff–Appellee,**

**v.**

**H.G. KUYKENDALL, Sr., individually and as an officer of National Marketing Services, Inc., NPC corporation of the Midwest, Inc. and Magazine Club Billing Service, Inc.; C.H. Kuykendall; Diversified Marketing Service Corporation, an Oklahoma corporation; National Marketing Service Inc., an Oklahoma corporation; NPC Corporation of the Midwest Inc., an Oklahoma corporation; H.G. Kuykendall, Jr.; Magazine Club Billings Service, an Oklahoma corporation, Defendants–Appellants.**

Nos. 02–6101, 02–6102.

United States Court of Appeals, Tenth Circuit.

Dec. 11, 2002.

Gregory J. Kerwin, Gibson, Dunn & Crutcher LLP (Taggart Hansen, Denver, CO; Andrew W. Lester and Susan B. Loving, Lester, Loving & Davies, Edmond, OK, with him on the briefs), Denver, CO, for Defendants–Appellants H.G. Kuykendall, Sr. and C.H. Kuykendall; Walter H. Sargent, Walter H. Sargent, a professional corporation (Stephen G. Solomon and George W. Velotta II, Derryberry, Quigley, Solomon & Naifeh, Oklahoma City, OK, with him on the briefs), Colorado Springs, CO, for Defendants–Appellants Diversified Marketing Service Corp., National Marketing Service, Inc., NPC Corporation of the Midwest, Inc., Magazine Club Billing Service, Inc., and H.G. Kuykendall, Jr.

Michele Arington, Attorney, Federal Trade Commission (William E. Kovacic, General Counsel, John F. Daly, Deputy General Counsel, Gary L. Ivens and S. Brian Huseman, Of Counsel, with her on the brief), Washington, DC, for Plaintiff–Appellee.

Before TACHA, Chief Judge, ALDISERT* and McWILLIAMS, Circuit Judges.

ALDISERT, Circuit Judge.

Kuykendall family members and their corporations appeal from an order for contempt and require us to decide whether the district court engaged in sufficient findings of fact and provided adequate protections under the Due Process Clause in imposing a substantial financial award for consumer redress against them in favor of the Federal Trade Commission ("FTC" or "Commission"). Specifically, we must determine whether the proceedings culminating in a $39 million award for violation of a injunction met minimum requirements of the Clause. Appellants also challenge certain evidentiary rulings.

Appellants argue that: (a) the contempt order fails to include sufficient findings of fact and conclusions of law; (b) the court deprived Appellants rights assured by the Due Process Clause; (c) the court erred in relying on inadmissible preliminary injunction findings and hearsay declarations; and (d) the award of $39 million for consumer redress is contrary to undisputed record evidence.

In addition, H.G. Kuykendall, Sr. and C.H. Kuykendall (the "Senior Kuykendalls" or "Seniors") individually appeal from the district court's order denying their motion to be dismissed from the contempt proceedings on the premise that they played no role in the management of

* Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

the Appellant corporations during the relevant period of alleged contempt.

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. Appellants filed a timely notice of appeal. To the extent that the contempt order modified provisions of an injunction, we have jurisdiction under 28 U.S.C. §§ 1292(a)(1) and 1294. In addition, the district court certified its order pursuant to Rule 54(b), Federal Rules of Civil Procedure, finding no reason for delay of entry of the order.

■■ In reviewing the court's determination of civil contempt, we must decide whether the court abused its discretion. "A district court has broad discretion in using its contempt power to require adherence to court orders." *O'Connor v. Midwest Pipe Fabrications, Inc.,* 972 F.2d 1204, 1209 (10th Cir.1992) (citations omitted). "Abuse of discretion is established if the district court's adjudication of the contempt proceedings is based upon an error of law or a clearly erroneous finding of fact." *Reliance Ins., Co. v. Mast Constr. Co.,* 84 F.3d 372, 375–376 (10th Cir.1996). Whether a district court denied due process to litigants "is a legal question subject to de novo review on appeal." *Thomas, Head & Greisen Employees Trust v. Buster,* 95 F.3d 1449, 1458 (9th Cir.1996).

■■ "Evidentiary decisions rest with the sound discretion of the trial court, and we review those decisions only for an abuse of discretion. Our review is especially deferential when the challenged ruling concerns the admissibility of evidence that is allegedly hearsay." *United States v. Tome,* 61 F.3d 1446, 1449 (10th Cir. 1995).

## I.

In 1996, the FTC filed a complaint against the individual and corporate Appellants for violations of § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, alleging various deceptive and misleading acts and practices in the telemarketing of magazine subscription packages. The Senior Kuykendalls and H.G. Kuykendall, Jr. were sued in their individual capacity as well as officers of the corporate Appellants. The corporate defendants were Diversified Marketing Service, Corp. ("DMS"), National Marketing Service, Inc., NPC Corporation of the Midwest, Inc., and Magazine Club Billing Service Inc. These businesses were owned and operated by the Kuykendall family as part of a common telemarketing enterprise to sell magazine subscription packages.

The FTC alleged that the individual and corporate Appellants misrepresented the price and duration of subscription packages, misrepresented consumers' ability to cancel subscription packages, failed to cancel packages when requested, misrepresented the need for and use of consumers' credit card and bank account information, engaged in unauthorized billing of consumers' credit card and bank accounts, threatened to harm consumers' credit ratings and wrongfully reported consumer arrears to credit reporting agencies resulting in damage to consumers' credit standing.

The FTC moved the court for a temporary restraining order ("TRO") and an order to show cause why a preliminary injunction should not issue. The court granted the FTC's request for a TRO and conducted a hearing for the preliminary injunction in which the Commission offered evidence of consumer complaints to third parties such as the Better Business Bureau and state attorneys general. The FTC also presented evidence of consumer complaints made directly to Appellants. On July 2, 1996, the district court issued a preliminary injunction that enjoined all Appellants from specified business practices, froze the assets of the corporate

Appellants and H.G. Kuykendall Jr. and appointed a temporary receiver for the corporate Appellants pending conclusion of a trial on the merits.

**A.**

All Appellants appealed the preliminary injunction but prior to trial the parties negotiated and agreed to a settlement. The terms of the parties' settlement were incorporated into a "STIPULATED FINAL JUDGMENT AND ORDER FOR PERMANENT INJUNCTION" ("Permanent Injunction") filed October 18, 1996. App. at 1019. The Permanent Injunction outlined 24 separate paragraphs governing Appellants' future conduct including the specific enjoining of Appellants from: (a) misrepresenting of the cost or duration of any magazine subscription—the purpose for which Appellants will use a consumer's credit card or bank account information; (b) misrepresenting a consumer's ability to cancel subscriptions or that a consumer's credit rating will be damaged by failing to pay for a magazine subscription package; (c) failing to comply with applicable state laws governing subscription cancellation; (d) submitting information concerning a consumer's failure to pay for a subscription when the consumer exercised a right to cancel or the Appellants do not possess documentary evidence of an obligation to pay; (e) submitting charges or any negotiable instrument to a consumer's credit card or bank account unless Appellants have first obtained both the consumer's express agreement to purchase and the authorization to bill charges; (f) failing to comply with the Telemarketing Sales Rule, 16 C.F.R. Part 310; (g) utilizing independent sales organizations unless such organizations adhere to detailed procedures outlined in Permanent Injunction; (h) processing any subscription order unless Appellants' tape recording of the conversation with the consumer (referred to as a "verification tape" and is meant to verify that a consumer is agreeing to purchase a magazine subscription) includes clear, complete and understandable disclosures of all material terms of the magazine subscription order; and (i) failing to cancel, at the consumer's request, all or any portion of a magazine subscription package purchased after the date of the Permanent Injunction when Appellants have reason to believe that any prohibited misrepresentation had been made.

Additionally, the Permanent Injunction required Appellants to create and maintain written records of consumer complaints for a period of five years, permit representatives of the FTC access to corporate offices and allow the FTC to monitor compliance. The Appellants were ordered to notify the FTC of any change in the employment status of the individual Appellants or the structure of the corporate Appellants that might affect these compliance obligations. The Appellants were also ordered to pay the Commission $1.5 million for consumer redress and subsequently file, within 90 days, a report with the Commission setting forth the manner in which they had complied with the Permanent Injunction.

The Senior Kuykendalls and H.G. Kuykendall Jr. signed the Permanent Injunction individually and as officers of the Appellant corporations. They also signed separate "Acknowledgment" statements indicating that they had read and understood the Telemarketing Sales Rule, the Compliance Guidelines of the Telemarketing Sales Rule and the Permanent Injunction, and that they agreed to comply with the applicable provisions of these documents for all of DMS' business practices.

In accordance with the Permanent Injunction, Appellants paid the $1.5 million and, within 90 days, filed their report with

the FTC setting forth the manner in which they had complied with the terms of the Permanent Injunction. The report addressed each of the Permanent Injunction's orders individually and discussed the Appellants' new business practices. The report also included appendices that contained sample subscription agreement forms drafted to comply with the Permanent Injunction, customer response forms drafted to elicit customer feedback and new company guidelines that were issued to Appellants' employees and independent agents. The Commission has subsequently complained in their appellate brief that Appellants did not provide any information concerning consumer complaints or copies of telemarketing scripts or verification tapes that would enable the FTC to determine whether Appellants' assurances of compliance were in fact accurate. Appellants assert, however, that at the time the report was filed, the FTC did not respond and gave no indication that compliance efforts were inadequate.

## B.

After receiving continued consumer complaints, the FTC notified Appellants in April 2001 of its concern that the Appellants were operating their business in violation of the Permanent Injunction. Pursuant to the agreed monitoring provisions, the FTC requested that the corporations furnish certain business records and stated that Commission representatives would be visiting Appellants' offices to conduct employee interviews. Among the records examined were telemarketing scripts, verification tapes, consumer complaints made directly to Appellants, consumer complaints made to third parties before being sent to Appellants for a response and electronic files comprising a database of numerous customer contacts. The FTC alleged that these materials illustrated a habitual violation of the Permanent Injunction and that deceptive, misleading and unfair patterns of business practice remained the norm. The FTC also alleged that Appellants' financial statements revealed profits from these proscribed practices approaching tens of millions of dollars.

On January 28, 2002, the FTC filed a motion in district court requesting an order to show cause why the Appellants should not be found in contempt for violating the Permanent Injunction. The Commission alleged that Appellants violated eight separate provisions of the Permanent Injunction and requested the court to: (a) determine that Appellants were in contempt of court; (b) enjoin them from further telemarketing until they could show that they can operate in compliance with the Permanent Injunction; (c) extend the monitoring provisions of the Permanent Injunction for an additional five years; and (d) award consumer redress in an amount of no less than $51 million. The district court entered an order to show cause on January 30, 2002, remitted Appellants' response to the order to be due under expedited briefing by February 13, 2002 and scheduled a hearing to be held on February 25, 2002.

Pursuant to the Appellants' request, the court granted a short extension to respond to the FTC's motion, but denied their request for a status and scheduling conference. The court also permitted Appellants to take depositions of FTC employees who had submitted declarations in support of the motion to show cause. Appellants subsequently filed a motion to dismiss the case asserting that they had been denied protections assured under the Due Process Clause and denied protections against improper hearsay evidence. The Senior Kuykendalls filed an additional motion to dismiss the case against them arguing that

they could not be held liable for contempt because they were not involved in the management or day-to-day operations of the Appellant corporations after 1996. Both motions were denied and the hearing commenced on the morning of February 25, 2002.

### C.

The hearing was held February 25 and 26, 2002. The Commission presented the testimony of eight witnesses: two consumers, an investigator in the Oklahoma Attorney General's Office, the individual Kuykendall Appellants, their customer service and collection manager and the corporate Appellants' accountant. The Appellants presented the testimony of four witnesses and had the opportunity to cross examine each of the FTC witnesses.

The district court found that the evidence presented by the FTC showed that the Appellants did engage in pervasive, deceptive practices. The testimony of two witnesses, Ms. Villalobos and Ms. Stewart, along with the Appellants' records documenting other consumer complaints and consumer declarations obtained by the Commission, were deemed to show "typical" experiences. Among the 67 direct consumer complaints that were proffered, 26 indicated that Appellants misrepresented the cost or duration of the subscription package. Among the 874 third-party complaints, 249 contained allegations of Appellants' misrepresentation of the cost or duration of the subscription packages. The FTC concluded by presenting testimony to the corporate Appellants' accountant to authenticate financial statements produced by the Appellants.

The Senior Kuykendalls admitted that when they signed the preliminary injunction, they knew it required them to take affirmative steps to ensure Appellants' compliance. They also knew that after signing the Permanent Injunction, they remained co-owners of the corporate Appellants until October or November 2001, at which time they sold their interest to Kuykendall Junior. The Seniors further admitted that their efforts to ensure compliance consisted of checking in periodically with the corporate Appellants' management and counsel. Although they could have asked to see consumer complaints or required changes in the telemarketing scripts, they did not do so and instead relied on Kuykendall Junior's leadership.

On March 1, 2002, the court entered orders denying motions to dismiss, and on March 4, 2002, the court entered an order for contempt finding each of the Appellants in civil contempt of the permanent injunction. The court determined that the injury to consumers caused by the Appellants' contemptuous conduct amounted to at least $39 million and ordered the Appellants to pay the Commission $39 million to be used for consumer redress.

### II.

■ Our beginning point is to evaluate Appellants' argument that the court erred in characterizing these proceedings as civil contempt. They contend that this was a criminal contempt proceeding and, as such, they were entitled to a trial by jury. We do not write on a clean slate on this issue. In *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994), the Supreme Court went to great pains to delineate the distinction between the two forms of contempt:

> "Criminal contempt is a crime in the ordinary sense," *Bloom v. Illinois*, 391 U.S. 194, 201, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), and "criminal penalties may not be imposed on someone who has not been afforded the protections that the

Constitution requires of such criminal proceedings," *Hicks v. Feiock,* 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). *See In re Bradley, 318 U.S. 50, 63 S.Ct. 470, 87 L.Ed. 608 (1943)* (double jeopardy); *Cooke v. United States,* 267 U.S. 517, 537, 45 S.Ct. 390, 69 L.Ed. 767 (1925) (rights to notice of charges, assistance of counsel, summary process, and to present a defense); *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797, (1911) (privilege against self-incrimination, right to proof beyond a reasonable doubt). For "serious" criminal contempts involving imprisonment of more than six months, these protections include the right to jury trial. *Bloom,* 391 U.S. at 199, 88 S.Ct. 1477; *see also Taylor v. Hayes,* 418 U.S. 488, 495, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974). In contrast, civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required. Although the procedural contours of the two forms of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are somewhat less clear. In the leading early case addressing this issue in the context of imprisonment, *Gompers v. Bucks Stove & Range Co.,* 221 U.S. at 441, 31 S.Ct. 492, the Court emphasized that whether a contempt is civil or criminal turns on the "character and purpose" of the sanction involved. Thus, a contempt sanction is considered civil if it "is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Ibid.*

*Bagwell,* 512 U.S. at 826–828, 114 S.Ct. 2552 (footnotes omitted).

Applying the foregoing precepts, we have no difficulty in concluding that the proceedings in the case at bar were for civil contempt. The sanction imposed was remedial and not designed to vindicate the authority of the court. Nor were the monetary sanctions to be paid to a court clerk as a fine—or even to some third party non-profit organization as was the case in *FTC v. Figgie Int'l,* 994 F.2d 595 (9th Cir.1993) (holding that the portion of the court order that provided for distribution of unclaimed funds to non-profit safety organizations was criminally punitive).

In the instant case, the FTC asked for a monetary sanction to provide redress to consumers injured by Appellants' conduct in violation of the Permanent Injunction. Evidence was presented by the Commission concerning the fact and amount of injury to consumers and the court stated that it was making the $39 million award as redress for consumer injury resulting from the Appellants' insubordinate conduct. The court even entitled the second section of its contempt order, "Compensation for Injuries resulting from Defendants' Contumacious Conduct." App. at 558. By its terms the order requires that all funds "shall be deposited into a fund administered by the Commission or its agent to the used for *equitable relief,* including but not limited to, *consumer redress." Id.* at 559 (emphasis added). Consumer redress is a classic remedial sanction.

### III.

But having decided that the contempt proceeding was civil in nature does not end our inquiry. We must determine whether the procedure utilized by the district court in assessing damages in the amount of $39

million was constitutionally adequate to protect the Appellants' right to due process.

■ With a nod to Gertrude Stein, there are civil contempts and there are civil contempts. *Bagwell* teaches that not all civil contempt proceedings require the same procedural protections to satisfy Due Process requirements. At one end of the spectrum are those proceedings that require a minimum of fact-finding:

> Certain indirect contempts ... are appropriate for imposition through civil proceedings. Contempts such as failure to comply with document discovery, for example, while occurring outside the court's presence, impede the court's ability to adjudicate the proceedings before it and thus touch upon the core justification for the contempt power. Courts traditionally have broad authority through means other than contempt— such as by striking pleadings, assessing costs, excluding evidence, and entering default judgment—to penalize a party's failure to comply with the rules of conduct governing the litigation process. *See, e.g., Fed. Rules Civ. Proc.* 11, 37. Such judicial sanctions never have been considered criminal, and the imposition of civil, coercive fines to police the litigation process appears consistent with this authority. Similarly, indirect contempts involving discrete, readily ascertainable acts, such as turning over a key or payment of a judgment, properly may be adjudicated through civil proceedings since the need for extensive, impartial factfinding is less pressing.

*Bagwell,* 512 U.S. at 833, 114 S.Ct. 2552. In such cases it is well established that civil contempt sanctions "may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Id.* at 827, 114 S.Ct. 2552.

■ At the higher end of the spectrum, specifically with respect to contempts involving defiance of sophisticated injunctions, more detailed and conscientious procedural protections are required:

> Contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding. *Cf. Green v. United States,* 356 U.S. 165, 217, n. 33, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958) (Black, J., dissenting) ("Alleged contempts committed beyond the court's presence where the judge has no personal knowledge of the material facts are especially suited for trial by jury. A hearing must be held, witnesses must be called, and evidence taken in any event. And often ... crucial facts are in close dispute" (citation omitted)). Such contempts do not obstruct the court's ability to adjudicate the proceedings before it, and the risk of erroneous deprivation from the lack of a neutral factfinder may be substantial. 356 U.S. at 214–215, 78 S.Ct. 632. Under these circumstances, criminal procedural protections such as the rights to counsel and proof beyond a reasonable doubt are both necessary and appropriate to protect the due process rights of parties and prevent the arbitrary exercise of judicial power.

*Bagwell,* 512 U.S. at 833–834, 114 S.Ct. 2552.

What procedural protections satisfy the dictates of the Due Process Clause before a substantiated financial sanction may be imposed is a difficult question. The FTC contends the full panoply of criminal law protections to a civil contempt proceeding suggested in *Bagwell* applies only when a court determines that the sanctions imposed were not compensatory. The Commission seeks to persuade us that because the present sanction is deemed compensatory, *Bagwell's* high-end exception should not apply. It argues that such an inter-

pretation would directly contravene the established case law, reaffirmed in *Bagwell*, that judges are authorized "to enter broad compensatory awards for all contempts through civil proceedings." *Id.* at 838, 114 S.Ct. 2552.

We disagree. Even though *Bagwell* itself was not a compensatory sanctions case, the Court initially engaged in a prolonged analysis of civil and criminal contempt judgments, and then applied its analysis to the facts before it. At no time did the Court confine its detailed analysis and specific exception for "complex injunctions" to any particular set of civil contempt proceedings. The Court began its discussion by stating that the civil and criminal distinction depended on both the "character *and* purpose" of the sanction involved. *Id.* at 827, 114 S.Ct. 2552 (emphasis added). Other courts have similarly interpreted the teaching of *Bagwell*.

In *Equal Employment Opportunity Comm'n v. Local 638, Sheet Metal Workers' Int'l Assoc.*, 13 F.Supp.2d 453 (S.D.N.Y.1998), the court encountered an opportunity to interpret *Bagwell* as it determined the type of process due defendants in a civil contempt proceeding. Without differentiating between compensatory and non-compensatory damages, the court recognized *Bagwell's* general premise that full evidentiary hearings are not required in cases where civil contempt sanctions are imposed, however, the court was quick to appreciate that *Bagwell* "carv[ed] out an exception to this general rule in cases involving out-of-court disobedience to complex injunctions in which crucial facts are in close dispute, [and] may necessitate the holding of a hearing, the calling of witnesses, and the presentation of evidence by the parties." *Local 638*, 13 F.Supp.2d. at 458. The court went on to conclude that the "*Bagwell* exception"—as it was coined—did not apply because of the

simplicity of the issues presented. *Id.* Similarly, in *Nat'l Labor Relations Bd. v. Ironworkers Local 433*, 169 F.3d 1217 (9th Cir.1999), the court, while conceding that similar disconcert was not present in the case before it, paid heed to the concerns raised by the Court in *Bagwell:*

> [T]he Court in Bagwell was clearly concerned about the possible abuse of power when a judge orders oppressive sanctions for violations of complex standards of the judge's own making. *See Bagwell*, 512 U.S. at 831, 114 S.Ct. 2552 (recognizing that "the contempt power ... is 'liable to abuse' "). The Court explained that the contempt power is unique because "civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Id.* Furthermore, when the contempts involve "out-of-court disobedience to complex injunctions" that "often require elaborate and reliable factfinding," the Supreme Court observed that "the risk of erroneous deprivation from the lack of a neutral factfinder may be substantial." *Id.* at 834, 114 S.Ct. 2552.

*Ironworkers Local 433*, 169 F.3d at 1220.

Most recently, in *United States v. Santee Sioux Tribe of Neb.*, 254 F.3d 728, 736 (8th Cir.2001), the court applied the doctrine of *Bagwell* to civil compensatory sanctions imposed against an Indian Tribe for violations of a gaming act. The court determined that the injunction, unlike that in *Bagwell*, was not complex and therefore a traditional civil contempt hearing was sufficient procedural protection to ensure simply that the Tribe cease gaming.

It is against the background of the foregoing tenets that we now turn to the case at hand.

## IV.

In the instant case, the injunction is decisively complex. As previously outlined, the Permanent Injunction essentially served as a code of conduct that was judicially drafted to intimately govern the Appellants' behavior. The Appellants were bound by detailed prohibitions rather than superficially discernable mandates. To calculate a precise loss sustained by consumers and then to formulate a proper dollar amount necessary for redress, it is necessary that there be extensive and impartial fact-finding.

In *Bagwell*, the Court concluded that an injunction was "complex" merely because it proscribed certain union conduct during protests. Supporters were prohibited from obstructing ingress and egress, throwing objects, physically threatening employees, placing tire-damaging "jackrocks" on roads and picketing with more than a specified number of demonstrators. 512 U.S. at 822, 114 S.Ct. 2552 (a determination that was separate from the Court's finding that the sanctions were not compensatory). The present injunction is decisively more complex. It involves the supervision of a intricate marketing program occurring in the private and relatively intangible medium of wire communications rather than on real and public company property. Accordingly, we hold that we are dealing with a complex injunction and apply the appropriate fact-finding procedures.

We emphasize initially that we bridle our opinion in agreement with the court's determination that:

> The evidence clearly and convincingly indicates that the defendants' acts and practices in connection with the sale of magazine subscriptions and magazine subscription packages violate the ... injunctive provisions of the Permanent Injunction ... [V]iolations have occurred

between October 21, 1996, and the date of this Order [March 4, 2002] and include many instances of: a) misrepresentation of the costs of the defendants' subscription packages; b) misrepresentation of the cost of the subscription packages by describing the cost as merely a shipping charge; c) misrepresentation of the cost of the subscription packages by describing some of the magazine subscriptions therein as "free"; d) misrepresentation of consumers' ability to cancel defendants' subscription packages, e) misrepresentation that consumers can cancel at any time; f) misrepresentation of the enforceability of defendants' subscription package agreements; and g) violating the Telemarketing Sales Rule.

*FTC v. Kuykendall*, No. CIV–96–388–M, 2 (W.D.Okla. Mar. 4, 2002) (Order for Contempt and Modifying the Permanent Injunction), *reprinted in* App. at 557.

 We are not, however, satisfied that the fact-finding procedure utilized by the district court in calculating a multimillion dollar sanction in this complex case complied with the protections assured by the Due Process Clause. Before the defense had an opportunity to present its case to rebut a claim of $51 million made by the FTC, the court, sitting as factfinder on February 25, 2002, stated that it "sees no reason why we cannot be concluded with this matter by the close of business today," App. at 571, and even instructed defense counsel to "reserve [its] opening until the beginning of [its] evidence," App. at 581, before directing the FTC to call its first witness. Suggesting that the defendants have only one day to present its defense of a $51 million claim is, to say the least, strong medicine.

The heart of the FTC case in calculating the amount of consumer redress stemmed from Appellants corporate financial state-

ment presented by the Appellants to the FTC in April, 2001. These statements indicated that the corporate defendants received approximately $44 million from consumers during the years 1997 through 2000, while refunding approximately $2 million during the same period. The FTC asked the court to extrapolate an amount for 2001 year, suggesting that if the conduct persisted through the end of that year, Appellants would probably have taken in another $10 million while returning approximately $1 million. On the basis of these statistics, the FTC stated that "[b]y the end of 2001, defendants' [sic] will have grossed approximately $51 million from their contumacious operations over the past five years," and that "[a]ccordingly, the Commission prays that the Court enter an award for consumer redress against defendants for no less than $51,000,000." App at 72–73. Basically, the FTC claimed that every dollar of revenue was the product of deceit.

We agree that in civil contempt cases compensatory awards may be granted for total losses sustained as a result of the contumacy. *United States v. United Mine Workers of Am.* 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Moreover, consumer redress in FTC cases has been measured by the amount of sales less refunds. *McGregor v. Chierico* 206 F.3d 1378, 1387 (11th Cir.2000); *Figgie Int'l* 994 F.2d at 606. In the present case, however, the judicial determination of the award for consumer redress was an "action[ ] tried upon the facts without a jury." Rule 52(a), Federal Rules of Civil Procedure. Under Rule 52(a), "the court shall find the facts specially" but the present record shows that the sole finding of fact is found in the court's March 4, 2002 Order, *I. Findings*, ¶ 4, which reads in its entirety: "The evidence further indicates that the consumer injury caused by defendants'

contumacious conduct amounts to at least $39 million." *Reprinted in* App. at 558.

Such a casual finding of millions of dollars without one iota of explanation does not meet the fact-finding requirement of Rule 52. The court supplied absolutely no indication how it arrived at this amount— no formula, no set of guidelines, no explanation, not even the most rudimentary reckoning of cause and effect to demonstrate the extent and the manner in which the consumers had been damaged. Absent any explication whatsoever, such an award is arbitrary and capricious. The teachings of *Bagwell* do not permit such a naked statement to suffice in a proceeding relating to a violation of a complex injunction.

Moreover, although the court has broad discretion in regulating the reception of evidence, in a proceeding where the Appellants stood in jeopardy of being assessed $51 million, the draconian timetable imposed by the court—"by the close of business today"—in and of itself, exceeds the limits of permissible discretion and dangerously approaches a complete violation of procedural due process.

This, too, must be said. We express no opinion on the amount of damages that were awarded by the court. Our problem has been with the procedures, and not with the quantum of sanctions previously imposed.

## V.

The Court teaches in *Bagwell* that there is no hard and fast rule to determine the minimum fact finding procedures to satisfy necessary protections of the Due Process Clause where a sanction is to be imposed for violating terms of an injunction. But the Court has furnished considerable guidance. As outlined, there may be cases where the general rule should

**1342**

apply—"civil contempt sanctions ... may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard"—and others where the facts describing the violation of a complex injunction are universally controverted and a jury must be empaneled and the burden of proof beyond a reasonable doubt standard should be employed to establish both the violation and the amount of remedial damages. 512 U.S. at 827, 114 S.Ct. 2552. We do not believe that the latter draconian requirement should be imposed here.

■ First, as stated previously, we are satisfied that the court properly determined that the Appellants were in violation of the Permanent Injunction. We affirm its determination of liability in all respects. Considering the nature of the factual defenses interposed by the Appellants in the previous truncated hearing, we conclude that the protections afforded by the Due Process Clause can be satisfied by remanding these proceedings for a new trial only for the purpose of determining the amount of consumer injury caused by Appellants' contumacious conduct. In accordance with the directions from the Court in *Bagwell*, we conclude that a jury should be utilized to determine the complex facts necessary to render an appropriate award. As to the burden of proof, we note that the district court stated that the FTC's burden of proof is the standard of clear and convincing evidence. *See Kuykendall*, No. CIV-96-388-M, 2 (Order for Contempt and Modifying the Permanent Injunction), *reprinted in* App. at 557. The same burden will be utilized in the limited new trial before a jury.

## VI.

■ The Seniors assert they should not have been found jointly and severally liable for the contempt sanctions because they were not involved in the affairs of the Appellant corporations and therefore they lacked the requisite knowledge and involvement in the post–1995 Permanent Injunction activities of the corporations. They contend that they resigned from their offices in the Appellant corporations and have not been involved in the day-to-day operations, have not supervised sales operations, did not write or edit marketing scripts and were generally unaware of the alleged violations in the appellant corporations' marketing practices.

■ We do not agree that this is sufficient to immunize them. Preliminarily, we note that the Seniors did not notify the FTC of any change in their employment status as required by the Permanent Injunction. More important, however, a party may defend a contempt charge on the ground that compliance is impossible, but that defense is not available when the inability to comply is self-induced. "[A]n individual who is responsible for insuring that a corporation complies with a court order cannot escape liability merely by removing himself from the day-to-day operations of the corporation and washing his hands of responsibility." *United States v. Voss*, 82 F.3d 1521, 1526 (10th Cir.1996) (quoting *Colonial Williamsburg Found. v. Kittinger Co.*, 792 F.Supp. 1397, 1406 (E.D.Va.1992), *aff'd.*, 38 F.3d 133, 136 (4th Cir.1994)). The district court properly found that the Seniors, as signatories of the Permanent Injunction, agreed to undertake a variety of affirmative obligations to ensure the Appellant corporations' compliance. Voluntary self-removal does not prevent potential liability.

We hold that because the Seniors occupied positions of responsibility for the Appellant corporations' conduct relating to the Permanent Injunction, they were properly joined with Kuykendall Junior and the Appellant corporations in the contempt

proceedings. They shall remain so joined in the limited new trial for damages.

## VII.

Although we remand for a new trial, we nevertheless meet the evidentiary question raised by Appellants. In exercise of its discretion, the district court determined that the consumer declarations and complaints satisfied each of the elements of the rule governing the residual exception to hearsay Rule 807, Federal Rules of Evidence. The declarations and complaints had circumstantial guarantees of trustworthiness as all were made under oath subject to penalty of perjury, *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 576 (7th Cir.1989). Additionally, the declarations were being offered as evidence of Appellants' violation of the Permanent Injunction and the court found that "reasonable efforts" could not have produced more probative evidence under the circumstances of the hearing and their admission provided the court with greater opportunity to ascertain the truth and eliminate expense and delay. *FTC v. Kuykendall,* Case No. CIV–96–388–M, 4 (D.C.Okla. March 1, 2002) (Order), *reprinted in* App. at 554. The Appellants were also given notice of the consumer declarations approximately one month before the evidentiary hearing and had the opportunity to subpoena the individual consumers if they so desired. We are satisfied that the district court did not exceed its permissible discretionary authority.

Declarations of FTC employees were also properly admitted pursuant to Rule 1006, Federal Rules of Evidence, that provides, in pertinent part, that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." The declarations were properly ac-cepted as summaries of evidence obtained from Appellants' business records. We conclude that in this respect also, the district court did not exceed its appropriate discretionary authority.

\* \* \* \* \* \*

We have considered all contentions raised by the parties and conclude that no further discussion is necessary.

We **AFFIRM** the judgment of the district court except its determination of the amount of monetary sanctions to redress consumer injuries. We **REMAND** the proceedings for a limited new trial in accordance with the procedures hereinbefore set forth.